UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SHERWYN TOPPIN MARKETING CONSULTANTS, INC.
d/b/a TEMPTATIONS TAVERN, and EWART BURTON,
individually,

Plaintiffs

--Against --

CITY OF NEW YORK, and
JOHN DOES I through V, *individually*,[1]
SERGEANT MORRIS, individually,
CAPTAIN SARYIAN, individually,
ERIKA DONLON, individually,
SERGEANT FAILLA, individually,
LAU YIU TUNG, individually,
LORRAINE WINTERS, individually,
CHARLES DELGADO, individually,
UNDERCOVER OFFICER #0238,
JOHN DOES I through V,

Defendants
-------------------------------------------------------X

**AMENDED COMPLAINT**
<u>JURY TRIAL DEMANDED</u>
08-Civ-1340 (ERK) (VVP)

Plaintiffs, SHERWYN TOPPIN MARKETING CONSULTANTS, INC.

d/b/a TEMPTATIONS TAVERN, and EWART BURTON, individually, by their attorneys,

LAW OFFICES OF AMBROSE WOTORSON, allege as follows:

I.      INTRODUCTION

1.      This is an action to vindicate the civil rights of plaintiffs. Plaintiffs contend that

defendants harassed and maliciously prosecuted them, falsely arrested and imprisoned them,

maliciously abused criminal and civil process against them, violated their due process rights,

violated their liberty interest rights, and maliciously violated their equal rights. Moreover, there

is ample evidence that defendants, in shameful efforts to have the nightclub known as

Temptations Tavern closed down by any means necessary, resorted to giving perjured testimony

---

[1] The true identities of the numerous other law enforcement personnel who engaged in illegal acts against plaintiffs are unknown, and are therefore called John Does, I through IV, until they are identified.

1

in nuisance abatement and State Liquor Authority proceedings, and portions of that perjured testimony was *suborned* by attorneys employed by the New York City Police Department. These misdeeds are made actionable through 42 U.S.C. Section 1983, and these misdeeds are ongoing in nature.

II.    <u>JURISDICTION</u>

2.    This Court has jurisdiction over this action under 42 U.S.C. Section 1983. Venue is proper, as the operative events occurred within this judicial district.

III.    <u>PARTIES</u>

3.    SHERWYN TOPPIN MARKETING CONSULTANTS, INC. is a "person," and it is a privately-owned company that is incorporated in the State of New York. It may sue and be sued, and its principal place of business is located at 2210 Church Avenue  in Brooklyn, New York, and at all relevant times, it operated TEMPTATIONS TAVERN, (hereinafter "the club") a cultural arts center located in Kings County, New York.

4.    EWART BURTON, (hereinafter "plaintiff") who resides in Kings County, New York, hereby sues in on his own behalf, individually. At all relevant times, plaintiff served as the General Manager of SHERWYN TOPPIN MARKETING CONSULTANTS, INC., d/b/a TEMPTATIONS TAVERN, and was falsely arrested on several occasions, most recently on March 5, 2011.

5.    CITY OF NEW YORK, (hereinafter, "municipal defendant") is a state actor for 42 U.S.C. Section 1983 purposes. Defendant may sue and be sued, and its principle place of business is in New York County, New York. At all relevant times, City of New York employed the individual defendants listed herein. It is sued for having violated plaintiffs' civil rights while acting under color of state law and/or acting pursuant to its own practices, customs and policies.

6.      Defendants, "SERGEANT" MORRIS, individually; "CAPTAIN" SARYIAN, "SERGEANT" FAILLA, individually; "OFFICER" DONLON, individually, LAU YIU TUNG, individually, LORAINE WINTERS, individually, CHARLES DELGADO, individually, UNDERCOVER OFFICER #0238, individually and JOHN DOES I through V, individually, at all relevant times, were employed by the City of New York as inspectors, police officers, undercover officers, captains, and/or sergeants. However, they are herein sued in their individual capacities for violating plaintiffs' protected civil rights while acting under color of state law and/or acting pursuant to practices, customs and policies of the City of New York.

IV.    FACTUAL AVERMENTS

7.      Defendants violated plaintiffs' civil and commercial rights in the following ways:

a.      Plaintiffs have been the subjects of numerous summonses, and Temptations Tavern has been shut down or forced to close its doors on numerous occasions because of illegal police actions. This has negatively impacted upon plaintiffs' goodwill with the community. The aforementioned police actions hurt plaintiffs' business as loyal patrons became fearful of returning due to their expectation of illegal police actions. The venue has now earned a negative reputation as a place where the police frequently undertake questionable "enforcement" actions which appear to be designed solely to harass plaintiffs and their patrons.

b.      Indeed, defendants frequently and pervasively, forwarded criminal summonses to Kings County Courts and the New York State Liquor Authority which were often false, and resulting in lost time, lost income and club closures. For example, the club was closed as direct result of untenable "enforcement action" on June 13, 2005, with a resultant loss of revenue.

c.          On March 27, 2005, Police Officer Charles Kee issued a ticket to plaintiffs for the consumption of alcohol after hours. Yet, the ticket was dismissed and the proceeding terminated in plaintiffs' favor. This is not surprising since plaintiffs had specific written policies and practices in place, which prohibited and prevented alcohol consumption after 4:30 a.m.

d.          On February 11, 2006, Officer Jennifer Childs arrested and imprisoned Ewart Burton and one other staff members for the sale of alcohol *after 4:00 a.m.* The ticket was dismissed and the proceeding terminated in plaintiff's favor. This is not surprising, since plaintiffs had specific policies and practices which prohibited and prevented the sale alcohol after 4:00 a.m.

e.          Burton sought out Council Member Yvette Clarke who scheduled a meeting at her district office on March 24, 2006, with plaintiff, a Lieutenant Woods, and various NYPD "task force" members of the Brooklyn Borough South Office; Detective Jones from the Police Commissioner's Office, Inspector Harris and other assistants from the 70th Precinct; Carolyn James Saunders from the Mayor's Office; Anita Taylor, the Chief of Staff for the Council Member Clarke's District Office; and Ray Martin, the Chief of Staff for Council Member Letita James' Office.

f.          Within a *few hours* after the meeting with the council members and other officials on March 24, 2006, Sergeant Morris threatened to close the establishment down. Indeed, at about 4:00 a.m., Captain Saryian, Sergeant Morris and approximately thirty other officers, returned to the establishment and set up "roadblocks" on Church Avenue, Bedford Avenue and Flatbush Avenue with the expressed intention of discouraging potential patrons from entering Temptations Tavern.

Subsequently, no cars were permitted entrance, and all patrons leaving the area in car or on foot were harassed, and some instances, *searched,* without any articulable suspicion for doing so. Plaintiffs video-recorded much of this harassment. Moreover, such roadblocks, which were not sobriety checkpoints or vehicle safety inspection checkpoints, had the affect of alarming patrons and scaring them away. This process of setting up illegal roadblocks as a form of harassment is a specific practice and policy of the New York City Police Department and has been utilized on numerous occasions against similarly situated establishments in Brooklyn.

g.      On March 25, 2006, Officer Erika Donaldson issued three summonses to plaintiffs for disorderly premises, unnecessary noise, and the sale of alcohol after 4:00 a.m. The tickets were later dismissed and the proceeding terminated in plaintiff's favor, as plaintiffs made no such sales after 4: 00 a.m., and contemporaneously-recorded videos fully supported plaintiffs' version of events.

h.      The videotaping of events on March 24, 2006 to March 25, 2006, showed police officers entering the premise, a ticket being written up for serving alcohol after 4am, and two officers stationed by the bar confirming with another officer *that there was no alcohol being sold after 4:00 a.m.* When a staff member who was accused of serving alcoholic beverages after 4am asked why he was being issued a ticket, an officer replied, "Sir, you just heard me tell the other officer that drinks weren't being sold while the officers *were on* the premise." The tape further showed that the manager explained that there had been announcements that had been made periodically stating that the bar closes at 4:00am. The Captain then stated that if anyone was seen after 4:30am drinking "*anything*", there would be

summonses issued. This threat to issue illegal summonses for perfectly legal behavior was captured on film, and is indicative of the out-of-control, cowboy-like behavior of the NYPD with Temptations Tavern.

i.      On May 4, 2006, Temptations Tavern was closed again, upon an utterly frivolous nuisance abatement action.

j.      In fact, a Sergeant Morris was videotaped ordering officers to write bogus summonses which were ultimately used in closing Temptations Tavern down on May 4, 2006. Further, it is now a standard New York City practice, policy and custom to issue false or greatly exaggerated summonses as a way of "stockpiling" claims against Brooklyn nightclubs for use in the State Liquor Authority procedures.

k.      On July 20, 2006, an Inspector McClary of the New York City Fire Department conducted a "Place of Assembly" Inspection. The establishment passed the inspection. Inspector McClary then wrote a statement which he signed "PA Inspection *Good to Go*."

l.      Yet, thereafter, on July 29, 2006, Temptations Taverns was visited by the New York City Police Department, the New York City Department of Health, the Department of Consumer Affairs, the New York State Liquor Authority, the New York City Environmental Control Board, the New York City Department of Buildings, the New York City Sheriff's Department and the New York City Marshall. These entities closed down the establishment for approximately two hours to conduct an "investigation." The so-called "investigation" was recorded on videotape. Upon completing the investigation, Temptations Tavern received a total of three (3) violations: one from the State Liquor Authority, one from the

New York City Environmental Control Board, and one from the New York City Department of Health. All of these citations were frivolous.

m.    Indeed, Plaintiffs went to Court on September 18, 2006, and the violation from the New York Environment Control Board was dismissed. This ticket was dismissed and the proceeding terminated in plaintiff's favor.

n.    On October 27, 2006, Inspector McClary *returned* to the establishment for a second "inspection." When Plaintiff asked why another inspection was occurring so soon after the previous inspection, which plaintiffs passed, McClary stated that he had received a call from the *New York City Police Department requesting that he make another inspection of the premises.* Again, this evinces the lengths to which the City of New York will go in order to close down Temptations Tavern by any means necessary, illegal or not.

o.    Inspector McClary then issued two violations to the plaintiffs for failure to produce a record of monthly standpipe inspections, and failure to provide proof of a certificate of fitness for maintenance of the standpipe system.

p.    On December 12, 2006, Hearing Officer, Patrick J. Sullivan found plaintiffs not guilty of these violations, and the quasi-criminal procedure terminated in Temptations' favor.

q.    On February 23, 2007, Police Officer Nicholas Lagano issued two summonses for non-licensed security at the establishment. Yet, said security guards had valid security licenses at that time. Thus, these tickets were dismissed and the proceeding terminated in plaintiffs' favor, yet again.

r.    On March 10, 2007, Undercover Police Officer 824 allegedly witnesses the sale of alcohol during prohibited hours, allegedly recognized metal barriers in front of

the entrance to the premises, and allegedly observed, along with other officers, the employment of unlicensed security guards, one of whom was allegedly in possession of a knife and an expandable baton. These tickets were dismissed and the corresponding proceedings terminated in plaintiffs' favor, yet again. The undercover officer's testimony strained credulity and he appeared to have perjured himself, yet he was never disciplined in any regard.

s.      On March 28, 2007, an inspection was carried out at Temptations Tavern by the New York City Fire Department. Temptations Tavern passed this inspection. Yet, not three days later, on March 31, 2007, another inspection was carried out by the New York City Police Department, the New York City Fire Department, the New York City Department of Health and the New York City Department of Buildings. The same inspectors who were present at the March 28, 2007 inspection, were present for the March 31, 2007 inspection. When a Temptations' manager asked why another inspection was occurring so soon after the previous inspection, he was told that the New York City Police Department requested that another inspection be done. Upon completing the investigation, Temptations received two (2) violations from the New York City Department of Buildings and two (2) violations from the New York City Police Department. These tickets were later dismissed and the proceedings terminated in plaintiffs' favor, yet again.

t.      On July 28, 2007, Police Officer Ivette Serano issued a summons for the warehousing and sale of alcohol without a license. Plaintiff Burton was arrested and imprisoned for this alleged violation. The ticket was dismissed and the proceeding terminated in plaintiffs' favor, yet again.

u.        Another method of harassment has taken the form of an arresting ritual of Burton,

and Temptation Tavern's staff members and patrons. Indeed, to date, plaintiff has

been arrested numerous times, along with numerous staff members and patrons

who were falsely accused of being employees of Temptation Tavern, within the

last three (3) years. Each and every charge brought against Burton and

Temptation Tavern's staff and patrons confused with staff has resulted in

dismissal, and virtually all such proceedings terminated in plaintiffs' favor. These

actions were undertaken for illegitimate purposes, and defendants maliciously

abused the criminal process, and quasi-criminal process on each occasion.

v.        On or about 5:35 a.m. on January 6, 2008, officers from the 67th Precinct entered

Temptations Tavern. The officers claimed that they were "just driving by and just

wanted to know *why* the establishment was still open." The officers from the 67th

Precinct said that maybe the 70th Precinct allowed plaintiffs to stay open, but any

establishment under their jurisdiction (meaning the 67th precinct) knows that it

must be closed by 4:00am. These officers stated that what plaintiffs were "getting

away with," won't be happening any longer, and that the New York City Police

Department would be coming by every weekend to make sure that Temptation

Tavern was never opened past 4:00a.m. This threat by NYPD to commit

completely illegal and indeed criminal actions were overheard and witnessed by

numerous witnesses.

w.       Thereafter, these officers entered the establishment and proceeded to walk

throughout the establishment. They walked directly to the DJ booth and turned on

the lights and said that it was time that this club was closed, even though, there is

no mandated "closing time"  and defendants have been unable to produce a single

credible community complaint against plaintiffs in their entire ten to eleven years of existence.

x.     During these harassing visits, Captain Jack Lewis later told Burton that he was responsible for closing nightclubs in his area and that plaintiff should "ask Mr. Crooks about that." Lewis also said that he would "see to it" that plaintiffs abided "by the law."

y.     The City of New York, through defendant, Police Officer Lau Yiu Tung, claimed that on December 25, 2009, "a male patron assaulted another male patron another patron by punching him in the face," and that police officers responded to Temptations Tavern, and that the victim was taken to the hospital.  The City did not present any such live testimony, and notably, failed to attach any substantiation to their initial motion papers that such an incident ever occurred.

z.     Yet, Nadica Davies, a security guard for Temptations Tavern testified at trial and states in her affidavit, that on December 25, 2009, *there were no incidents whatsoever at Temptations Tavern that night, inside or outside of the location.* She noted that there was simply no documented incident wherein a male assaulted another male by punching him in the face. Davies also explained that Temptations maintains incident reports, and she was unable to locate any such incident report for December 25, 2009.  Further, she explained that no patron complained to the staff of Temptations Tavern about being punched in the face. To date, defendants have utterly failed to produce documents of such an incident. It is policy to eject disorderly patrons, or where there is an incident of serious assault, to detain the assailant and to alert the police immediately. No such incident took place on that date. (Exhibit "2").

aa.     This false evidence was later presented to the New York State Liquor Authority on or about March 18, 2011, in a desperate effort to have Temptations Tavern closed down. Importantly, these allegations were contained in an illegal and utterly false affidavit which, upon information and belief, was written by an NYPD lawyer, who falsely claimed to witness the officers sign their document in his presence.

bb.     The City of New York, through defendant Police Officer Loraine Winters, claimed that on January 9, 2010, "a male patron had punched another male in the face thereby causing injuries to the victim. " The City even claimed that that in their motion papers that the "offending patron was charged with violation of penal law section 120.04(1)." Incredibly, the City also claimed, through Loraine Winters' affidavit, that this alleged violence occurred *inside the club*.

cc.     Antonio Hines and Barrington Holness, two Security Guards stated that on January 9, 2010, at approximately 12:15 am, two men who were arguing from half a block away from Temptations Tavern, got into a loud argument. The men continued to argue as they walked closer and closer to the club. Importantly, they did not join the admittance queue and they *were not* potential patrons. They had absolutely nothing to do with Temptation Tavern. As they were continuing to check IDs, they both waved over the police and asked them to deal with the individuals who were distracting them. The police later intervened, and told the men to "take a walk." Hines and Holness explained that the police *did not* arrest any of these individuals.

dd.     This false evidence was later presented to the New York State Liquor Authority on or about March 18, 2011, in a desperate effort to have Temptations Tavern

closed down. Importantly, these allegations were contained in an illegal and utterly false affidavit, which, upon information and belief, was written by an NYPD lawyer, who falsely claimed to witness the officers sign their document in his presence.

ee.    The City of New York, through defendant Police Officer Charles Delgado, claimed that on April 11, 2010, testified that a security guard assaulted a patron by punching the patron in the face. However, on cross examination, Delgado admitted that he signed an affidavit under oath, that he actually observed two patrons engaged in a verbal dispute *in front of the club*, and that he observed one of the patrons suddenly strike the other patron with a closed fist, in front of the club. Delgado is unable to explain this serious contradiction between what he testified to at a hearing and what he signed under oath, in his affidavit.

ff.    Joseph Robinson, a security guard for Temptations explained in his own affidavit that at April 11, 2010, at approximately 5:30 a.m., he observed two patrons *attempt* to fight other patrons at the coat check area. Robinson and a co-worker, Bob Pierre, who is also a security guard, immediately responded to the location, defused the situation and escorted the offending patrons out of the building. At no time were they assaulted by any security guards or any other patrons. (Exhibit "5").

gg.    This false evidence was later presented to the New York State Liquor Authority on or about March 18, 2011, in a desperate effort to have Temptations Tavern closed down. Importantly, these allegations were contained in an illegal and utterly false affidavit, which, upon information and belief, was written by an NYPD lawyer, who falsely claimed to witness the officers sign their document in

his presence.

hh.     The City of New York, through defendant UC#0224, claimed that on April 17, 2010 between 4:15 a.m. and 5:00 a.m., he observed six (6) bartenders sell alcohol to various individuals. None of the alcohol was vouchered, and no contemporaneous recording of these offenses were presented by the City to establish that any such after-hours sales or any after-hours consumption actually occurred. When the UC was asked how he knew the beverages being sold and/or consumed at prohibited hours was alcohol, he claimed that the patrons told him that they were consuming alcohol. However, he did not get any names, nor did he direct that any of them be arrested.

ii.     This false evidence was later presented to the New York State Liquor Authority on or about March 18, 2011, in a desperate effort to have Temptations Tavern closed down. Importantly, these allegations were contained in an illegal and utterly false affidavit, which, upon information and belief, was written by an NYPD lawyer, who falsely claimed to witness the officers sign their document in his presence.

jj.     By contrast, Temptations credibly presented video recordings establishing that the bar was closed when the police officers arrived. In fact, the Court saw and heard a detailed count down to 4:00 a.m. by the club's MC, detailing and establishing that the bar was closed at 4:00 a.m. Further, there was no evidence on the video recordings of numerous individuals consuming alcohol or smoking marijuana.

kk.     As well, Temptation has presented twelve (12) affidavits, executed as far back as May 2010, establishing that the bar closed promptly at 4:00 a.m.. (Exhibits "6" and "7").

ll.         The City of New York, through Police Officer Nicholas Savary, claimed that a

male hit a female patron in the face causing her to suffer pain and swelling on

May 13, 2010. Officer Savary also explained that the "offending patron was

arrested and charged with violation of penal law section 120.00(1), and unlawful

possession of marijuana.

mm.         This false evidence was later presented to the New York State Liquor Authority

on or about March 18, 2011, in a desperate effort to have Temptations Tavern

closed down. Importantly, these allegations were contained in an illegal and

utterly false affidavit, which, upon information and belief, was written by an

NYPD lawyer, who falsely claimed to witness the officers sign their document in

his presence.

nn.         Savary explained at  a hearing, that the male was ejected from the club at around

2:00 a.m., and that about two hours later after she left the club, she re-encountered

the male and they got into an argument. Savary also explained that the male was

then detained by "bystanders." However, he could neither confirm nor deny that

these bystanders, were, in fact, undercover security officers.  In fact, the alleged

"bystanders" were Security Guards.

oo.         Harold Downer, Temptations Security Chief, explained that it was clear from

Temptations' own investigation, that the male and female in question were known

to each other, and were romantically involved. He explained that when the female

left the club and walked about two blocks away, the male who had been ejected

from the club suddenly, and seemingly out of nowhere, pounced upon his

girlfriend. Downer states that the police, who had been seated in a parked RMP

stationed directly outside of the club, immediately travelled down the block,

broke up the argument, and arrested the male who had been ejected. The incident was completely unforeseeable, and it took place away from Temptations Tavern. Importantly, the police were present, outside and in front of the club when the male was ejected from the club. They were in a much better position to observe and to notice that the male was apparently lying in wait for his girlfriend. (Exhibit "8").

pp.     Moreover, Security Guards at Temptations only allows 21 year olds to enter, and only 351 patrons at a time are permitted to be inside of Temptations Tavern. Downer also explained that that security guards patrol the club wearing bright yellow vests, and that they have other security guards who are in plain clothes to avoid detection. (Exhibit "8").

qq.     Downer further notes that there is an extensive video surveillance system which also assists in security and safety maintenance, and critically, there are signs placed throughout the club advising that fighting, drug ingestions and drug smoking  will not be tolerated. (Exhibit "8").

rr.     The City of New York, through Police Officer Tanika Harbor,  claimed that a male patron who had been ejected from the club on July 8, 2010, return in a fit of rage and fired a gun at one of these security guards who was station outside of the club.

ss.     Gregory Small and Joseph Robinson state in their affidavits that on July 8, 2010, a male patron was bothering a female patron. Both guards promptly escorted the male out of Temptations Tavern. They did not use any physical force to eject the patron. He was compliant, however he did say that he "would be back." Smalls decided to inform the police of the threat, which he did not take too seriously, but

the police were not present at the club that night. Thus he went back to performing his duties. (Exhibits "5" and "9").

tt.     Unfortunately, the patron returned and fired a gun at Gregory Smalls, who was stationed outside. It was unforeseeable that the male would return and shoot a gun at Smalls, as embarrassed patrons frequently make boastful threats when they are ejected. There was no reason to suspect that this situation was any different. (Exhibit "9").

uu.     The City of New York, through defendant UC #0238, claimed to have spent $250 on July 24, 2010, in pre-recorded buy money to purchase alcoholic beverages after hours and to purchase marijuana inside the club. The UC also claimed that he drank portions of the alcoholic beverage on at least three occasions before he called in the field team. He also claimed that he purchased a bottle of Vodka from a bartender, who was the only bartender arrested that night after he (the UC) specifically identified her on the dance floor while she was dancing. While a voucher for marijuana was presented, the voucher did not state from whence the marijuana was obtained or from whom it was obtained, as there was no arrest, even thought the UC specifically identified the seller as a "JD Goldfront" to the field team.

vv.     This false evidence was later presented to the New York State Liquor Authority on or about March 18, 2011, in a desperate effort to have Temptations Tavern closed down. Importantly, these allegations were contained in an illegal and utterly false affidavit, which, upon information and belief, was written by an NYPD lawyer, who falsely claimed to witness the officers sign their document in his presence.

ww.     The UC admitted later at a hearing that he neither his affidavit nor any of the

police paperwork in court said anything about purchasing a bottle of Vodka from

a bartender. He also admitted that he did not save the bottle of Vodka because

*somebody allegedly took it away from him, and that he did not know who took it*

*away.* The UC claimed to have detailed all of this in a DD-5, which,

paradoxically, neither he nor the NYPD lawyers produced in Court. Upon

information and belief, no such DD-5s exist, and an NYPD attorney falsely

asserted in open Court that it was withheld for confidentiality purposes. Critically,

no effort was made to recover the pre-recorded buy money, the bottle of Vodka or

the phantom drug dealer, at least for evidentiary purposes.

xx.     The City of New York, through UC #0137, claimed to have purchased *numerous*

alcoholic beverages after hours from bartenders on August 14, 2010, and that he

observed *numerous* patrons consuming alcoholic beverages between 4:45 a.m.

and 5:30 a.m.

yy.     However, plaintiffs possess a video recording establishing that the bar was closed

when the police arrived. While the recording did show a single individual who

appeared to be consuming an alcoholic beverage, the recoding also showed that

one of the managers, Christopher Mangal, promptly told the patron to put the

bottle down once he observed it.

zz.     Christopher Mangal stated in an affidavit, that on August 14, 2010, while he was

working as a manger, Temptations Tavern's staff followed its regular procedures

with respect to the sale of alcohol to patrons/consumption of alcohol by

patrons/security and proper comportment of patrons as is depicted on relevant and

time-stamped DVDs. (Exhibit "10").

aaa.          On August 14, 2010, the management team arrived at approximately 11:00 p.m., which is about an hour before they typically begin accepting patrons at 12:00 a.m. The establishment typically has at least twenty-two (22) guards on duty each night, for no more than 351 patrons each night. The management team walked around the club several times to ensure that all staff were performing their assigned functions and got the club ready to open. They also telephoned the 70th precinct to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club. (Exhibit "10").

bbb.          The management team also had a fifteen-minute meeting to designate which areas Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss any events of the previous nights and to review the written list of banned individuals to make sure no such individuals are admitted. As is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away. Christopher Mangal does not recall if any individuals on August 14, 2010 had any controlled substances and/or marijuana on their persons. But, if any of the potential patrons did have controlled substances and/or marijuana, they would have been turned away before they even entered the building. (Exhibit "10").

ccc.          While the staff at Temptations have never found a gun or firearm on a potential patron, its Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately. Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which

are obviously fashioned for or used as knives, are taken away from the potential patrons. (Exhibit "10").

ddd.    In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located. The bar team arrived at approximately 11:00 p.m., which is about an hour before staff members typically begin accepting patrons at 12:00 a.m. (Exhibit "10").

eee.    Once the establishment is opened for business, it sold beer, wine and any other form of alcohol from 12:00a.m. to 4:00 a.m. The bar closes and they stop selling alcohol and any other type of beverage promptly at 4:00 a.m. However, at least 15 minutes before closing the single bar, the DJ makes an announcement over the loudspeaker that they are having a "last call" for the sale of alcoholic beverages and non-alcoholic beverages. At 4:00 am, an announcement is made that the bar is now closed and that the consumption of all beverages will be permitted up and until 4:30 am and that all unconsumed and partially consumed drinks would be confiscated at 4:30 am and that anybody found with an alcoholic beverage risked being arrested by the police. Thereafter, the bar backs, typically five (5) in number, search for bottles, glasses or other containers, secure or discard them, and confiscate all drinks which are partially consumed or not yet consumed. (Exhibit "10").

fff.    On August 14, 2010, Christopher Mangal was arrested for "possession of alcoholic beverages." Mangal states in an affidavit, that no alcohol was sold after 4:00 am while Mangal was the supervisor on duty, and none was consumed after

4:30 a.m. while he was on duty. Importantly, no patron was openly smoking marijuana on the premises, and in fact, there are numerous "no smoking" signs posted around the club. Further, throughout the night, as is club policy, announcements are made, that no marijuana smoking or the consumption of other controlled substances are permitted on the premises, and that violators will be banned from the club. (Exhibit "10").

ggg.     While Mangal was shown a videotape of him apparently telling a patron to get rid of a drink that looked like Guinness Stout, he had no recollection of the incident.

hhh.     The City of New York, through defendant Police Officer Gerald Williams, claimed that on October 10, 2010, two female victims had been involved in a verbal dispute with a third female patron while in the ballroom area of the premises. Williams states that the third female then broke a glass goblet and used it to assault the victim, causing multiple lacerations to their faces, and that both victims were taken to Kings County Hospital.

iii.     This false evidence was later presented to the New York State Liquor Authority on or about March 18, 2011, in a desperate effort to have Temptations Tavern closed down. Importantly, these allegations were contained in an illegal and utterly false affidavit, which, upon information and belief, was written by an NYPD lawyer, who falsely claimed to witness the officers sign their document in his presence.

jjj.     However, Desron Forde and Eugene Reese, two of the security guards at Temptation Tavern explained in their affidavits that they observed three women suddenly begin punching and kicking at each other. None of them possessed any weapons. Mr. Forde and Mr. Reese immediately separated the women, and

escorted two of them out of the club. One of the females, who was apparently the victim, was allowed to stay in the club, so that she would not be assaulted any further outside of the club. These women were not, to Mr. Forde's and Mr. Reese's knowledge, on the list of banned individuals. The fight was sudden, and it was totally unforeseeable. No loud argument had preceded the fight, and it was broken up as soon as it started. (Exhibits "11" and "12").

kkk.    The City of New York, through Police Officer Billy Choi, claimed that on March 5, 2011, bartenders had sold alcoholic beverages to a UC after hours. The City of New York, through UC #0155, claimed to have purchased *numerous* alcoholic beverages after hours from bartenders until approximately 6:20 a.m. Ewart Burton and a bartender, Whitney Perkins, were falsely arrested as a result.

lll.    Whitney Perkins stated in her affidavit that the bar team arrived at approximately 11:00pm  on March 5, 2011, which is about an hour before the establishment typically begins accepting patrons at 12:00am.  Ms. Perkins states that on that date, the bar team initially began the night by "prepping" the bar. That is, they set up all of the drinks that they typically sold. Once the establishment was opened for business, they sold beer, wine and any other form of alcohol from 12:00 a.m. to 4:00 a.m. (Exhibit "13").

mmm.    However, at least 15 minutes before the bar is closed, the DJ made several announcements over the loudspeaker that they were having a "last call" for the sale of alcoholic beverages and non-alcoholic beverages. At 4:00 am, an announcement was made that the bar was now closed. The bar closed and the stopped selling alcohol and any other type of beverage promptly at 4:00 a.m. (Exhibit "13").

nnn.     In fact, Ms. Perkins in her affidavit states that she left the bar once it was closed and went onto the dance floor to dance with friends and co-workers. It was the DJs birthday, and Ms. Perkins was dancing with the DJ's girlfriend when the police arrived. They later arrested Ms. Perkins for selling alcohol after hours, even though the bar had already been closed when the police arrived. (Exhibit "13").

ooo.     Later, defendant Sergeant Failla began speaking to Mr. Burton in Ms. Perkins's presence. In her affidavit, Ms. Perkins states that she witnessed one of the non-uniformed officers who was a black woman sarcastically say to Mr. Burton that his lawsuit "was not going to go through" because there was no racism involved." (Exhibit "13"). This is proof positive that illegal actions undertaken by NYPD and the City of New York against plaintiffs was retaliation for the instant lawsuit.

ppp.     After spending a full day in a jail cell, Ms. Perkins was offered an ACD, which she rejected. Her "case" is still pending. (Exhibit "13").

qqq.     As well, in her affidavit, Ms. Jacqueline Grenardo states that on March 5, 2011, she observed and heard a black female officer tell Mr. Burton that the City was going to shut down Temptations Tavern permanently.  Later, a male Sergeant Failla bragged in front of patrons that he was going to close Temptations permanently because "he could." Ms. Grenardo states in her affidavit, that she witnessed the Sergeant Failla say several other threatening things to Burton, and spoke to him like he was a child. (Exhibit "14").

rrr.     Jacqueline Grenardo is a secretary with Temptations Tavern.  She states in her affidavit, that she maintains in the regular course of business, written policies which are posted in the front of the lobby and near the monitors of the club.

(Exhibit "14").

sss.    Those written and posted  policies, for all patrons to see are:  (1) "No fighting", (2) "No drug of any kind", (3) "No weapons", (4) "No sneakers", (5) "Mandatory coat check" in the lobby, (6) "No cash refunds", (7) "no soliciting", (8) admittance only for patrons "21 and over" (9) "valid ID", (10) "bars closes at 4:00 am" (11) "last call is at 3:45 am" (12) "No drinking after 4:30am", (13) "No smoking," and (14) "No gang affiliation attire." (Exhibit "14").

ttt.    As well, Ms. Grenardo states that she maintains, in the regular course of business, a roster of at least twenty-two (22) security guards. (Exhibit "14").

uuu.    Ms. Grenardo also states that she maintains in the regular course of business, a written list of individuals who are banned from the club. (Exhibit "14").

vvv.    They also maintain, in the regular course of business, a data base of VIP card holders complete with names, addresses, telephone numbers, birthdates and emails, all of which are all linked to the establishment's Facebook pages so that they also have pictures of each individual. Ms. Grenardo states that they maintain this VIP list for marketing, as well as for security purposes. (Exhibit "14").

www.    Ms. Grenardo also states that she maintains in the regular course of business, archived videotapes  and DVDs which depict Temptations Tavern policies and procedures being followed, and police actions at the club. They also maintain, in the regular course of business, incident reports certain incidents. Ms. Grenardo personally photocopied eight summonses from patrons who were ticketed for after-hours consumption, when, in fact, the prohibited consumption time had not yet come. (Exhibit "14").

xxx.    Alec Christopher is one of the bar backs at Temptation Tavern. Typically, there

are about five (5) bar backs each night. Mr. Christopher states in his affidavit that the bar-backs search for bottles, glasses or other containers after 4:30 a.m. and discard them. They confiscate all drinks, which have been partially consumed or have not yet consumed at 4:30 am. (Exhibit "18").

8.    Upon information and belief, defendants have undertaken similar illegal actions against other establishments in Brooklyn that are primarily owned and operated by Black people and Black people from the Caribbean. In fact, the Brooklyn/Staten Island Vice Enforcement Squad in the month of July 2007, targeted restaurants, nightclubs, bars and social venues that were overwhelmingly Black and/or Caribbean owned and controlled. Defendants' pattern of harassment has been with one goal in mind: to drive SHERWYN TOPPIN MARKETING CONSULTANTS, INC. d/b/a TEMPTATIONS TAVERN out of business and to prevent the peaceful assembly of primarily Black people and Black people from the Caribbean who wish to openly associate with each other, for the purposes of socializing, political rallies and networking. In fact, as a direct result of defendants' harassment and various closings, TEMPTATIONS TAVERN is barely able to function as a commercial entity. TEMPTATIONS TAVERN primarily Black and Caribbean patrons come less and less, and TEMPTATIONS TAVERN is simply unable to afford its overhead expenses at this point.

9.    Defendants' illegal actions were undertaken pursuant to municipal defendants' customs, practices and policies.

10.    Moreover, plaintiffs' rights with respect to having false arrests, false imprisonment, malicious prosecution, malicious abuse of criminal and civil process, due process, liberty interests, and the commerce clause are clearly established, and reasonable persons employed by the City of New York are aware of these rights, or have reasons to be so aware of these rights.

11.    As a further proximate result of defendants' illegal acts towards plaintiffs, plaintiffs have

suffered a substantial and permanent loss of revenue.

12.    As a further proximate result of defendants' illegal actions towards plaintiffs, plaintiffs have suffered substantial and permanent impairment and damage to their good names and reputations.

13.    As a further proximate result of defendants' illegal actions, plaintiff, EWART BURTON has suffered mental anguish and emotional injury, in part because of his false arrests.

14.    Individual defendants' illegal actions were outrageous and were malicious, and were intended to injure plaintiffs, and were done with reckless indifference to plaintiffs' protected rights, entitling plaintiffs to punitive damages as against all individual defendants herein.

V.    CAUSES OF ACTION

FIRST CAUSE OF ACTION

15.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

16.    The defendants violated the Fourth and Fourteenth Amendments of The United States Constitution by falsely arresting, by falsely searching, by falsely imprisoning, by maliciously prosecuting and by maliciously abusing criminal and quasi-criminal process against plaintiffs. These violations are made actionable through 42 U.S.C. Section 1983.

SECOND CAUSE OF ACTION

17.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

18.    Defendants have undertaken a pattern of harassment, false arrests, false imprisonments, curtailment of commercial activities, malicious prosecutions, illegal searches and malicious abuses of process against all plaintiffs who are Black and of Caribbean national origin and alienage, or are Black owned and/or Caribbean-owned. Defendants have not typically undertaken such actions against establishments that are not Black or Caribbean owned, and individuals who are not Black or from the Caribbean. Defendants are unable to offer any rational basis for this

disparity. Defendants have violated the Equal Protection Clause of the 14th Amendment. These actions are made actionable by 42 U.S.C. Section 1983; and separately by 42 U.S.C. Section 1981.

VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs pray that this Court grant to him judgment containing the following relief:

a.    Permanent Injunctive Relief;

b.    An award of damages to be determined at the time of trial to compensate plaintiffs for mental anguish, humiliation, embarrassment, and emotional injury,

c.    Awards of punitive damages to be determined at the time of trial as against each individual defendant;

d.    Awards of reasonable attorney fees and the costs of this action and,

e.    Such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York
       August 2, 2011

Respectfully Submitted,
Law Offices of Ambrose Wotorson

By_____/s/_____
Ambrose W. Wotorson (AWW-2412)
26 Court Street, Suite 1811
Brooklyn, New York 11242
718-797-4861