# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------X
CITY OF NEW YORK;

                              Plaintiff

       --Against –

**Index No.: 60015/2011**
**AFFIDAVIT OF**
**EWART BURTON**

THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY;
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                               Defendants
------------------------------------------------------------X

**EWART BURTON** being duly sworn and deposed, states that:

I am one of the managers at Temptation Tavern located at 2210 Church Avenue in Brooklyn, New York.

1.    On December 25, 2009, January 9, 2010, April 10, 2010, April 11, 2010, April 17, 2010, May 13, 2010, July 8, 2010, July 24, 2010, August 14, 2010, October 10, 2010, January 22, 2011, January 23, 2011and February 25, 2011, March 5, 2011, I was worked as a manger, at Temptations Tavern. Our staff followed our regular procedures with respect to the sale of alcohol to patrons, consumption of alcohol by patrons and proper comportment of patrons *as is depicted on relevant and time-stamped* DVDs that we have provided to this Honorable Court for its review.

2.    On each of above dates, the management team arrived at approximately 11:00 p.m., which is about an hour before we typically begin accepting patrons at 12:00 a.m. We typically have at least twenty-two (22) guards on duty each night, for no more than 351 patrons each night;

3.    On each of the dates in question, the management team walked around the club several times to ensure that all staff were performing their assigned functions and get the club ready to open.

4. We also telephoned the 70 precinct on each of the dates in question to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club;

5. We typically had a fifteen minute meeting each night to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss events of the any previous nights and to review our written list of banned individuals to make sure no such individuals are admitted;

6. As is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away.

7. While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

8. Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

9. In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to a coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located.

10. The bar team arrived at approximately 11:00 p.m., which is about an hour before we typically begin accepting patrons at 12:00 a.m.

11. Once we were opened for business, we sold beer, wine and any other form of alcohol from 12:00a.m. to 4:00 a.m.

12. The bar closed and we stopped selling alcohol and any other type of beverage promptly at 4:00 a.m. on each of the dates in question, as it is our policy to do so.

13. However, at least 15 minutes before we typically close the bar, the DJ makes an announcement over the loudspeaker that we were having a "last call" for the sale of alcoholic beverages and non-alcoholic beverages.

14. At 4:00 am, an announcement is made that the bar is now closed and that the consumption of all beverages will be permitted up and until 4:30 am and that all unconsumed and partially consumed drinks would be confiscated at 4:30 am and that anybody found with an alcoholic beverage risked will being arrested by the police.

15.     The bar closed and we stopped selling alcohol and any other type of beverage promptly at 4:00 a.m. on all of the dates in question. In fact, we fact, we have incontrovertible DVDs to evince this. Still several officers arrived and arrested me and other staff for selling alcohol after prohibited hours

16.     On March 5, 2011, two high-ranking officers – who were not uniformed – began taunting me. One of the non-uniformed officers was a black woman named Katrina Brownlee. Brownlee sarcastically offered, out-of-the-blue, that my federal lawsuit "was not going to go through" because there was "no racism." The other high ranking officers, Lou Failla, said to me that I no longer had a federal lawsuit, that it had been thrown out because there was no racism or harassment, because he that heard my lawyer was handling a lawsuit for Albany Manor, and that he was not a very good lawyer and that I should get a better lawyer next time, and that he (Failla) was going to shut me down permanently. Failla also said that he wants to be known as the guy who closed down the biggest club in Brooklyn, and that I make "too much money" anyway.

17.     In light of the above-explained policies and procedures, any violence which occurred inside Temptations Tavern or outside of it, was completely unforeseeable. Further, consistent without policies and practices, alcohol is not sold after 4:00am, and we confiscate partially consumed or unconsumed alcoholic beverages after 4:30am. As well, our security guards patrol the club wearing bright yellow vests, and we have other security guards who are in plain clothes to avoid detection. We also have an extensive video surveillance system which also assists in security and safety maintenance. Critically, we have signs placed throughout the club advising that drug ingestions and drug smoking  – inclusive of marijuana – will not be tolerated. There is nothing in any of the City of New York's submissions which suggests, or even establishes in a plausible fashion, that Temptations Tavern was recklessly maintained or that its management suffered or permitting  violence and/or illegal drugs to be used or to be trafficked therein.

Sworn before me this____day of March, 2011

_____
NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015

3

# Exhibit 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------X
CITY OF NEW YORK;

                       Plaintiff

    --Against --

                               **Index No.: 60015/2011**
                               **AFFIDAVIT OF**
                               **NADICA DAVIES**

THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY·
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                                  Defendants
------------------------------------------------------------X

**NADICA DAVIES** , being duly sworn and deposed, states that:

I am one of the security guards at Temptation Tavern located at 2210 Church Avenue in Brooklyn, New York. I am duly licensed as a Security Guard in the State of New York, and that my license is attached to this affidavit.

On December 25, 2009, while I was working as a security guard, Temptations Tavern's staff followed its regular procedures with respect to the sale of alcohol to patrons/consumption of alcohol by patrons/security and proper comportment of patrons _as is depicted on relevant and time-stamped_ DVDs that we have provided to this Honorable Court for its review. Those procedures are as follows:

<u>Security and proper comportment of patrons</u>

1.   On December 25, 2009, the team arrived at approximately 11:00 p.m., which are about an hour before we typically begin accepting patrons at 12:00 a.m. We typically have at least twenty-two (22) guards on duty each night, for no more than 351 patrons each night;

2.   We made a thorough search of the entire premises to make sure no illegal

1

contraband or potentially dangerous instruments or weapons were secreted inside of the premises or in its curtiliages. We do such sweeps each night that Temptations is expected to open for business;

3. We checked all of the radios to make sure they were in proper functioning order;

4. We ran diagnostics of the fire alarm system and the fire sprinkler system to ensure operability;

5. We ran diagnostics on the "ID" machine, which scans patrons' IDs to make sure they are valid and not fraudulent, and to create a record of each and every individual who is admitted. This machine also ensures that nobody under the age of 21 is admitted;

6. Patrons presented their IDs for scan when they joined the queues outside for admittance;

7. We checked the surveillance cameras to ensure that they were in proper working order;

8. We set up police barricades (which were donated to us by the New York City Police Department) outside, to ensure that patrons queued in an orderly fashion, separated by gender;

9. We also telephoned the 70 precinct to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club;

10. We always have a fifteen meeting to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss events of the any previous nights and to review our written list of banned individuals to make sure no such individuals are admitted;

11. Right before the doors were opened for business, we placed two licensed security guards a the beginning of the queues to check for illegitimate and /or illegal IDs and to ensure that all patrons were at least 21;

12. We placed four security guards on the queue outside to search patrons outside, before they even entered the building. While patrons were being searched outside, potential patrons were instructed to empty the contents of their pockets, purses or other bags into containers which we provided. Only after those contents have been emptied into a container and examined, did additional security guards conduct thorough pat-down searches of the potential patrons.

13. During this search, anything in liquid form, any forms of "medication", any pens or sharp objects – even combs -- stayed in secured containers until their owners patrons left for the night. Once those items were retrieved from the patrons, the patrons were not permitted re-entry at anytime that night.

2

14. Moreover, as is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away. I do no recall if any individuals on December 25, 2009 had any controlled substances and/or marijuana on their persons. But, if any of the potential patrons did have controlled substances and/or marijuana, they would have been turned away before they even entered the building.

15. While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

16. Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

17. Once the patrons entered the lobby, we conducted foot searches to check for any other weapons and controlled substances that might be secreted in the shoes of potential patrons. If controlled substances were found during these "foot searches," any potential patrons with such controlled substances are turned away, are not admitted and are politely asked to leave. When other smaller weapons or instruments, which could be fashioned to be used as weapons are found on potential patrons, those potential patrons are turned away, they are not admitted and they are politely asked to leave.

18. Importantly, Temptations has a VIP access card which allows patrons free admittance, so long as they continue to follow our rules and regulations which entails, "no sneakers," "no du rags," "no hats," "no hoodies," "no drugs of any kind," "no weapons," "no gang affiliation attire," and "no fighting." We have about eight hundred (800) card-carrying VIP members, whose names, addresses and telephone numbers we have logged in our database for marketing as well as security purposes.

19. Once the patrons went through the foot searches in the lobby, they were required to pay admittance fees or to present their VIP cards for free access.

20. In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located.

21. On December 25, 2009, contrary to police officer Lau Yiu Tung's affidavit, there were no incidents at Temptation Tavern that night, inside or outside of the location. There is simply no documented incident wherein a male assaulted another male by punching him in the face. We maintain incident reports and there is no incident report for December 25, 2009. Further, no patron complained to us about being punched in the face. It is policy to eject disorderly patrons, and where there is an incident of assault, to detain the assailant and to alert the police immediately. No such incident took place on that date.

_NADION DALUS_

Sworn before me this 21st day of March, 2011

NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015

Case 1:08-cv-01340-ERK-VVP Document 51 Filed 04/21/11 Page 10 of 25





# Exhibit 3

**Law Offices of Ambrose Wotorson**
**26 Court Street, Suite 1811, Brooklyn, New York 11242**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------X
CITY OF NEW YORK;

                                Plaintiff

      --Against --

                               **Index No.: 60015/2011**
                               **AFFIDAVIT OF**
                               **BARRINGTON HOLNESS**

THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY;
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                                Defendants
-----------------------------------------------------------X

**BARRINGTON HOLNESS** being duly sworn and deposed, states that:

I am one of the managers at Temptation Tavern located at 2210 Church Avenue in
Brooklyn, New York.

On December 25, 2009, January 9, 2010, April 10, 2010, April 11, 2010, April 17, 2010,
May 13, 2010, July 8, 2010, July 24, 2010, August 14, 2010, October 10, 2010, January
22, 2011, January 23, 2011, February 25, 2011, and March 5, 2011, I worked as a
manager at Temptations Tavern. Our staff followed our regular procedures with respect
to the sale of alcohol to patrons, consumption of alcohol by patrons and proper
comportment of patrons *as is depicted on relevant and time-stamped* DVDs that we have
provided to this Honorable Court for its review.

<u>Security and proper comportment of patrons</u>

1.     On each of above dates, the management team arrived at approximately 11:00 p.m.,
which is about an hour before we typically begin accepting patrons at 12:00 a.m. We
typically have at least twenty-two (22) guards on duty each night, for no more than 351
patrons each night;

1

2.  On each of the dates in question, the management team walked around the club several times to ensure that all staff were performing their assigned functions and get the club ready to open.

3.  We also telephoned the 70 precinct on each of the dates in question to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be stationed in front of the club.

4.  We typically had a fifteen minute meeting each night to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss events of the any previous nights and to review our written list of banned individuals to make sure no such individuals are admitted.

5.  As is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away.

6.  While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

7.  Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

8.  In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located. The bar team arrived at approximately 11:00 p.m., which is about an hour before we typically begin accepting patrons at 12:00 a.m.

9.  Once we were opened for business we sold beer, wine and any other form of alcohol from 12:00 a.m. to 4:00 a.m.

10. The bar closes and we stop selling alcohol and any other type of beverage promptly at 4:00 a.m.

11. However, at least 15 minutes before we close the bar, the DJ makes an announcement over the loudspeaker that we are having a "last call" for the sale of alcoholic beverages and non-alcoholic beverages.

12. At 4:00 a.m., an announcement is made that the bar was now closed and that the consumption of all beverages will be permitted up and until 4:30 a.m. and that all unconsumed and partially consumed drinks would be confiscated at 4:30 am and that anybody found with an alcoholic beverage risked will being arrested by the police.

2

13.     In light of the above-explained policies and procedures, any violence which occurred inside Temptations Tavern or outside of it, was completely unforeseeable. A person's internal rage before being admitted to the club is undetectable. There is no way for us to know in advance when female patrons, for example, are likely to start fights. Security only allow 21 year olds to enter, and only 351 patrons at a time. Our security guards patrol the club wearing bright yellow vests, and we have other security guards who are in plain clothes to avoid detection. We also have an extensive video surveillance system which also assists in security and safety maintenance. Critically, we have signs placed throughout the club advising that drug ingestions and drug smoking – inclusive of marijuana – will not be tolerated.

Sworn before me this _____ day of March, 2011

NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015

3

Case 1:08-cv-01340-ERK-VVP Document 51-2 Filed 04/21/11 Page 16 of 25

# Exhibit 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
---------------------------------------------------------X
CITY OF NEW YORK;

                          Plaintiff

       --Against –

                                  **Index No.: 60015/2011**
                                  **AFFIDAVIT OF**
                                  **ANTONIO HINES**

THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY;
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                                    Defendants
---------------------------------------------------------X

**ANTONIO HINES** being duly sworn and deposed, states that:

I am one of the security guards at Temptation Tavern located at 2210 Church Avenue in Brooklyn, New York. I am duly licensed as a Security Guard in the State of New York, and that my license is attached to this affidavit.

1.    On January 9, 2010, while I was working as a Security Guard, Temptations Tavern's staff followed its regular procedures with respect to the sale of alcohol to patrons/consumption of alcohol by patrons/security and proper comportment of patrons *as is depicted on relevant and time-stamped* DVDs that we have provided to this Honorable Court for its review. Those procedures are as follows:

<u>Security and proper comportment of patrons</u>

2.    On January 9, 2010, the team arrived at approximately 11:00 p.m., which is about an hour before we typically begin accepting patrons at 12:00 a.m. We typically have at least twenty-two (22) guards on duty each night, for no more than 351 patrons each night;

3.    We made a thorough search of the entire premises to make sure no illegal

1

contraband or potentially dangerous instruments or weapons were secreted inside of the premises or in its curtiliages. We do such sweeps each night that Temptations is expected to open for business.

4.     We checked all of the radios to make sure they were in proper functioning order.

5.     We ran diagnostics of the fire alarm system and the fire sprinkler system to ensure operability.

6.     We ran diagnostics on the "ID" machine, which scans patrons' IDs to make sure they are valid and not fraudulent, and to create a record of each and every individual who is admitted. This machine also ensures that nobody under the age of 21 is admitted.

7.     Patrons presented their IDs for scans when they joined the queues outside for admittance.

8.     We checked the surveillance cameras to ensure that they were in proper working order.

9.     We set up police barricades (which were donated to us by the New York City Police Department) outside, to ensure that patrons queued in an orderly fashion, separated by gender.

10.    We also telephoned the 70th precinct to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club.

11.    We always have a fifteen meeting to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss events of the any previous nights and to review our written list of banned individuals to make sure no such individuals are admitted;

12.    Right before the doors were opened for business, we placed two licensed security guards at the beginning of the queues to check for illegitimate and /or illegal IDs and to ensure that all patrons were at least 21.

13.    We placed four (4) security guards on the queue outside to search patrons outside, before they even entered the building. While patrons were being searched outside, potential patrons were instructed to empty the contents of their pockets, purses or other bags into containers which were provided. Only after those contents had been emptied into a container and examined, did additional security guards conduct thorough pat-down searches of the potential patrons.

14.    During this search, anything in liquid form, any forms of "medication," any pens or sharp objects – even combs -- stayed in the secured containers until their owners left for the night. Once those items were retrieved from the patrons, the patrons were not permitted re-entry at anytime that night.

2

15.    Moreover, as is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away. I do not recall if any individuals on January 9, 2010, had any controlled substances and/or marijuana on their persons. But, if any of the potential patrons did have controlled substances and/or marijuana, they would have been turned away before they even entered the building.

16.    While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

17.    Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

18.    Once the patrons entered the lobby, we conducted foot searches to check for any other weapons and controlled substances that might be secreted in the shoes of potential patrons. If controlled substances were found during these "foot searches," any potential patrons with such controlled substances are turned away, are not admitted and are politely asked to leave. When other smaller weapons or instruments, which could be fashioned to be used as weapons are found on potential patrons, those potential patrons are turned away, they are not admitted and they are politely asked to leave.

19.    Importantly, Temptations has a VIP access card which allows patrons free admittance, so long as they continue to follow our rules and regulations which entails, "no sneakers," "no du rags," "no hats," "no hoodies," "no drugs of any kind," "no weapons," "no gang affiliation attire," and "no fighting." We have about eight hundred (800) card-carrying VIP members, whose names, addresses and telephone numbers we have logged in our database for marketing as well as security purposes.

20.    Once the patrons went through the foot searches in the lobby, they were required to pay admittance fees or to present their VIP cards for free access.

21.    In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located.

22.    On January 9, 2010, at approximately 12:15 am, as I was doing ID checks of potential patrons outside of Temptations, two men from half a block away from Temptations, got into a loud argument. They continued to argue as they walked closer and closer to the club. Importantly, they did not join the admittance queue and they were not potential patrons. They had absolutely nothing to do with Temptation Tavern. As I was continuing to check IDs, I waved over the police and asked them to deal with these individuals who were distracting me. The police later intervened, and told them to "take a walk." The police failed to arrest these men for disorderly conduct.

3

Sworn before me this _____ day of March, 2011

NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015

Case 1:08-cv-01340-ERK-VVP Document 51-2 Filed 04/21/11 Page 20 of 25

# Exhibit 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------X
CITY OF NEW YORK;

                                   Plaintiff

    --Against –

                                              **Index No.: 60015/2011**
                                              AFFIDAVIT OF
                                              JOSEPH ROBINSON


THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY;
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                                   Defendants
-------------------------------------------------------X


JOESPH ROBINSON, being duly sworn and deposed, states that:

I am one of the security guards at Temptation Tavern located at 2210 Church Avenue in
Brooklyn, New York. I am duly licensed as a Security Guard in the State of New York,
and that my license is attached to this affidavit.

On  April 11, 2010,  while I was working as a security guard, Temptations Tavern's staff
followed its regular procedures with respect to the sale of alcohol to patrons/consumption
of alcohol by patrons/security and proper comportment of patrons *as is depicted on
relevant and time-stamped* DVDs that we have provided to this Honorable Court for its
review.  Those procedures are as follows:

<u>Security and proper comportment of patrons</u>

1.  On April 11, 2010, the team arrived at approximately 11:00 p.m., which are about an
    hour before we typically begin accepting patrons at 12:00 a.m.  We typically have at least
    twenty-two (22) guards on duty each night, for no more than 351 patrons each night;

2.  We made a thorough search of the entire premises to make sure no illegal

                                   1

contraband or potentially dangerous instruments or weapons were secreted inside of the premises or in its curtiliages. We do such sweeps each night that Temptations is expected to open for business;

3. We checked all of the radios to make sure they were in proper functioning order;

4. We ran diagnostics of the fire alarm system and the fire sprinkler system to ensure operability;

5. We ran diagnostics on the "ID" machine, which scans patrons' IDs to make sure they are valid and not fraudulent, and to create a record of each and every individual who is admitted. This machine also ensures that nobody under the age of 21 is admitted;

6. Patrons presented their IDs for scan when they joined the queues outside for admittance;

7. We checked the surveillance cameras to ensure that they were in proper working order;

8. We set up police barricades (which were donated to us by the New York City Police Department) outside, to ensure that patrons queued in an orderly fashion, separated by gender;

9. We also telephoned the 70 precinct to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club;

10. We always have a fifteen meeting to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss events of the any previous nights and to review our written list of banned individuals to make sure no such individuals are admitted;

11. Right before the doors were opened for business, we placed two licensed security guards a the beginning of the queues to check for illegitimate and /or illegal IDs and to ensure that all patrons were at least 21;

12. We placed four security guards on the queue outside to search patrons outside, before they even entered the building. While patrons were being searched outside, potential patrons were instructed to empty the contents of their pockets, purses or other bags into containers which we provided. Only after those contents have been emptied into a container and examined, did additional security guards conduct thorough pat-down searches of the potential patrons.

13. During this search, anything in liquid form, any forms of "medication", any pens or sharp objects –even combs -- stayed in secured containers until their owners patrons left for the night. Once those items were retrieved from the patrons, the patrons were not permitted re-entry at anytime that night.

2

14. Moreover, as is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away. I do no recall if any individuals on April 11, 2010 had any controlled substances and/or marijuana on their persons. But, if any of the potential patrons did have controlled substances and/or marijuana, they would have been turned away before they even entered the building.

15. While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

16. Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

17. Once the patrons entered the lobby, we conducted foot searches to check for any other weapons and controlled substances that might be secreted in the shoes of potential patrons. If controlled substances were found during these "foot searches," any potential patrons with such controlled substances are turned away, are not admitted and are politely asked to leave. When other smaller weapons or instruments, which could be fashioned to be used as weapons are found on potential patrons, those potential patrons are turned away, they are not admitted and they are politely asked to leave.

18. Importantly, Temptations has a VIP access card which allows patrons free admittance, so long as they continue to follow our rules and regulations which entails, "no sneakers," "no du rags," "no hats," "no hoodies," "no drugs of any kind," "no weapons," "no gang affiliation attire," and "no fighting." We have about eight hundred (800) card-carrying VIP members, whose names, addresses and telephone numbers we have logged in our database for marketing as well as security purposes.

19. Once the patrons went through the foot searches in the lobby, they were required to pay admittance fees or to present their VIP cards for free access.

20. In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located.

21. On April 11, 2010, at approximately 5:30 a.m., I observed two patrons attempt to fight other patrons at the coat check area. I and a co-worker, Bob Pierre, who is also a security guard, immediately responded to the location, defused the situation and escorted the patrons out of the building. At no time were they assaulted by security guards or any patrons.

3

22.      On July 8, 2010, a male patron was bothering a female patron. Me and a co-worker, Gregory Smalls, who is also a security guard, escorted the male out of the Temptations. We did not use any physical force to eject him. He was compliant. Once he was ejected from the club, I returned to my post inside of the club. I was not present when he returned and fired a gun at Gregory Smalls, who was stationed outside. It was unforseeable that the male would return and shoot a gun at Smalls, as embarrassed patrons frequently make boastful threat when they are ejected. There was no reason to suspect that this situation was different.

Sworn before me this ____ day of March, 2011

_____
NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015





718 - 715 - 5179