# Exhibit 7

UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SHERWYN TOPPIN MARKETING CONSULTANTS, INC.
d/b/a TEMPTATIONS TAVERN, and EWART BURTON,
individually,

                                 Plaintiffs

      --Against --

CITY OF NEW YORK, and
JOHN DOES I through V, *individually*,
SERGEANT MORRIS, individually,
CAPTAIN SARYIAN, individually,
ERIKA DONALDSON, individually,
                                Defendants
-----------------------------------------------------------X

                                    AFFIDAVIT OF
                                    STEPHANIE JOSEPH
                                    08-Cv-1340

STEPHANIE JOSEPH, who resides at 1335 Eastern Parkway, Brooklyn, New York

11233, telephone number: 718-709-1637, being duly sworn and deposed, states that:

1. On or about April 17, 2010, around 4:20 a.m. or so, while people were still dancing and music was still playing, NYPD police officers came rushing into the club. There were about 12 to 13 plain-clothes police officers, with clearly visible task force vests and/or jackets with their shields showing, who rushed into the club and immediately began to detain individuals, for no apparent reason. No alcohol was being sold at this time. The bar was closed.

2. I was standing in front of the DJ booth, and one of the police officers told me to come with him. He took me to the back of the club and detained me, along with the club's bartenders.

3. The police officers turned down the music so that nobody was dancing and ordered that the lights be turned on. This basically shut down the club, and the patrons began to leave the club.

4. I eventually was then taken back to stand with the other people, and I was handcuffed, in a chain-gang style and taken on an embarrassing perp walk, in front of the club along

1

with six (6) other individuals for no reason whatsoever.

5.  As we are on the perp walk, other police officers were saying things like, we were a "big herd," and that we were "six pieces."

6.  When I got to the 70th precinct, we were not told why we had been arrested. We were then taken to Central Booking. There, we were taken upstairs to jail cells.

7.  It was freezing cold in the precinct. We were not fed until approximately 10:00 a.m. the next day and were treated like garbage. A female police officer said, "if anybody gets an attitude, I can make you all stay longer." The cells were crowded and they refused to give us any toilet paper.

8.  I stayed in a cell for about 36 hours. I had not eaten the entire time. I was so miserable and desperate to get home, that when an "ACD" was offered to me, I immediately took it, not being sure what an "ACD" meant.

STEPHANIE JOSEPH

Sworn before me this 23rd day of March, 2011

NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015

# Exhibit 8

*Law Offices of Ambrose Wotorson*
*26 Court Street, Suite 1811, Brooklyn, New York 11242*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------X
CITY OF NEW YORK;

                               Plaintiff

      --Against –

                                 **Index No.: 60015/2011**
                                 **AFFIDAVIT HAROLD**
                                 **DOWNER**

THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY;
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                              Defendants
------------------------------------------------------------X

**HAROLD DOWNER** being duly sworn and deposed, states that:

I am a Head of Security/Manager at Temptation Tavern located at 2210 Church Avenue in Brooklyn, New York.

On December 25, 2009, January 9, 2010, April 10, 2010,  April 11, 2010, April 17, 2010, May 13, 2010, July 8, 2010, July 24, 2010, October 10, 2010**,** January 22, 2011, January 23, 2011, February 25, 2011 and March 5, 2011, I worked as Head of Security/Manager at Temptations Tavern. Our staff followed our regular procedures with respect to the sale of alcohol to patrons, consumption of alcohol by patrons and proper comportment of patrons *as is depicted on relevant and time-stamped* DVDs that we have provided to this Honorable Court for its review.

<u>Security and proper comportment of patrons</u>

1.     On each of above dates, the management team arrived at approximately 11:00 p.m., which is about an hour before we typically begin accepting patrons at 12:00 a.m.  We typically have at least twenty-two (22) guards on duty each night, for no more than 351 patrons each night;

2. On each of the dates in question, the management team walked around the club several times to ensure that all staff were performing their assigned functions and got the club ready to open

3. We also telephoned the 70 precinct on each of the dates in question to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club;

4. We typically had a fifteen minute meeting each night to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss events of the any previous nights and to review our written list of banned individuals to make sure no such individuals are admitted;

5. As is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away. I do no recall if any individuals on August 14, 2010, had any controlled substances and/or marijuana on their persons. But, if any of the potential patrons did have controlled substances and/or marijuana, they would have been turned away before they even entered the building.

6. While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

7. Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

8. In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located. The bar team arrived at approximately 11:00 p.m., which is about an hour before we typically begin accepting patrons at 12:00 a.m.

9. Once we were opened for business we sold beer, wine and any other form of alcohol from 12:00 a.m. to 4:00 a.m.

10. The bar closes and we stop selling alcohol and any other type of beverage promptly at 4:00 a.m.

11. However, at least 15 minutes before we close the bar, the DJ makes an announcement over the loudspeaker that we are having a "last call" for the sale of alcoholic beverages and non-alcoholic beverages.

12. At 4:00 a.m., an announcement is made that the bar was now closed and that the consumption of all beverages will be permitted up and until 4:30 a.m. and that all

2

unconsumed and partially consumed drinks would be confiscated at 4:30 a.m. and that anybody found with an alcoholic beverage risked will being arrested by the police.

13. In light of the above-explained policies and procedures, any violence which occurred inside Temptations Tavern or outside of it, was completely unforeseeable. A person's internal rage before being admitted to the club is undetectable. There is no way for us to know in advance when female patrons, for example, are likely to start fights. Security only allow 21 year olds to enter, and only 351 patrons at a time. Our security guards patrol the club wearing bright yellow vests, and we have other security guards who are in plain clothes to avoid detection. We also have an extensive video surveillance system which also assists in security and safety maintenance. Critically, we have signs placed throughout the club advising that drug ingestions and drug smoking – inclusive of marijuana – will not be tolerated.

14. On May 13, 2010, a male was ejected from the club for harassing his girlfriend at around 2:00 a.m. It was clear from our own investigation, that the male and female in question were known to each other, and were romantically involved. When the female left the club and walked about two blocks away, the male who had been ejected from the club suddenly, and seemingly out of nowhere, pounced upon his girlfriend and began to pummel her. The police, who had been seated in a parked RMP stationed directly outside of the club, immediately travelled down the block, broke up the fight and arrested the male who had been ejected. This incident was completely unforeseeable, and it took place at least two blocks away from Temptations Tavern. Importantly, the police were present, outside and in front of the club when the male was ejected from the club. They were in a much better position to observe and to notice that the male was lying in wait for the female, some two blocks away.

_____

Sworn before me this _____ day of March, 2011

_____
NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015



NEW YORK STATE DEPARTMENT OF STATE
DIVISION OF LICENSING SERVICES

HAROLD L. DOWNER

IS DULY REGISTERED AS A

SECURITY GUARD

ID: 10011516378
EXP: 11/03/12

This does not confer NYS Employee Status

Case 1:08-cv-01340-ERK-VVP Document 60-2 Filed 08/02/11 Page 9 of 28 PageID
Case v.08-cv-01340-ERK-VVP Document 51-5 Filed 04/21/11 Page 9 of 28
#: 583

# Exhibit 9

*Law Offices of Ambrose Wotorson*
*26 Court Street, Suite 1811, Brooklyn, New York 11242*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------X
CITY OF NEW YORK;

                        Plaintiff

       --Against –

                                     **Index No.: 60015/2011**
                                     **AFFIDAVIT OF**
                                     **GREGORY SMALL**

THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY;
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                                    Defendants
-----------------------------------------------------------X

**GREGORY SMALL** being duly sworn and deposed, states that:

I am one of the security guards at Temptation Tavern located at 2210 Church Avenue in
Brooklyn, New York. I am duly licensed as a Security Guard in the State of New York,
and that my license is attached to this affidavit.

On July 8, 2010, while I was working as a security guard, Temptations Tavern's staff
followed its regular procedures with respect to the sale of alcohol to patrons/consumption
of alcohol by patrons/security and proper comportment of patrons *as is depicted on
relevant and time-stamped* DVDs that we have provided to this Honorable Court for its
review. Those procedures are as follows:

<u>Security and proper comportment of patrons</u>

1. On July 8, 2010, the security guard team arrived at approximately 11:00 p.m., which is
about an hour before we typically begin accepting patrons at 12:00 a.m. We typically
have at least twenty-two (22) guards on duty each night, for no more than 351 patrons
each night;

2. We made a thorough search of the entire premises to make sure no illegal

contraband or potentially dangerous instruments or weapons were secreted inside of the premises or in its curtiliages. We do such sweeps each night that Temptations is expected to open for business;

3.   We checked all of the radios to make sure they were in proper functioning order;

4.   We ran diagnostics of the fire alarm system and the fire sprinkler system to ensure operability;

5.   We ran diagnostics on the "ID" machine, which scans patrons' IDs to make sure they are valid and not fraudulent, and to create a record of each and every individual who is admitted. This machine also ensures that nobody under the age of 21 is admitted;

6.   Patrons presented their IDs for scan when they  joined the queues outside for admittance;

7.   We checked the surveillance cameras to ensure that they were in proper working order;

8.   We set up police barricades (which were donated to us by the New York City Police Department) outside, to ensure that patrons queued in an orderly fashion, separated by gender;

9.   We also telephoned the 70 precinct to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club;

10.   We always have a fifteen meeting to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss events of the any previous nights and to review our written list of banned individuals to make sure no such individuals are admitted;

11.   Right before the doors were opened for business, we placed two licensed security guards a the beginning of the queues to check for illegitimate and /or illegal IDs and to ensure that all patrons were at least 21;

12.   We placed four security guards on the queue outside to search patrons outside, before they even entered the building. While patrons were being searched outside, potential patrons were instructed to empty the contents of their pockets, purses or other bags into containers which we provided. Only after those contents have been emptied into a container and examined, did additional security guards conduct thorough pat-down searches of the potential patrons.

13.   During this search, anything in liquid form, any forms of "medication", any pens or sharp objects -- combs -- stayed in secured containers until their owners patrons left for the night.  Once those items were retrieved from the patrons, the patrons were not permitted re-entry at anytime that night.

2

14. Moreover, as is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away. I do no recall if any individuals on July 8, 2010 2009 had any controlled substances and/or marijuana on their persons. But, if any of the potential patrons did have controlled substances and/or marijuana, they would have been turned away before they even entered the building.

15. While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

16. Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

17. Once the patrons entered the lobby, we conducted foot searches to check for any other weapons and controlled substances that might be secreted in the shoes of potential patrons. If controlled substances were found during these "foot searches," any potential patrons with such controlled substances are turned away, are not admitted and are politely asked to leave. When other smaller weapons or instruments, which could be fashioned to be used as weapons are found on potential patrons, those potential patrons are turned away, they are not admitted and they are politely asked to leave.

18. Importantly, Temptations has a VIP access card which allows patrons free admittance, so long as they continue to follow our rules and regulations which entails, "no sneakers," "no du rags," "no hats," "no hoodies," "no drugs of any kind," "no weapons," "no gang affiliation attire," and "no fighting." We have about eight hundred (800) card-carrying VIP members, whose names, addresses and telephone numbers we have logged in our database for marketing as well as security purposes.

19. Once the patrons went through the foot searches in the lobby, they were required to pay admittance fees or to present their VIP cards for free access.

20. In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located.

21. On July 8, 2010, a male patron touched a female patron inappropriately. Me, and co-worker, Joseph Robinson, who is also a security guard, escorted the male out of the premises, without any resistance. While he was cursing us, he was complaint. Once outside, he threatened that he would "be back." I had intended to report this threat to the police officer who is normally stationed in a police car right outside the club, but there was no police officer there that night. Unfortunately, within fifteen to twenty minutes, as I was searching a potential patron for admittance, I heard a metallic noise and when I

looked up to see what it was, the male patron who had been ejected earlier, fired a single gunshot at me and fled in an SUV. The gunshot grazed my right side. I was later transported to Kings County Hospital. There is nothing that I could have done to prevent this ejected patron from returning and taking a shot at me, as the police were not present when I attempted to alert them of the potential threat. Moreover, I had heard these kinds of threats before, and usually, such threats were empty boasts of people embarrassed about being ejected.

22. Here, me and a fellow guard followed an individual who had been starring at me. I had been shot a few months earlier, so we thought this guy might have some involvement in the shooting. We were trying to see his face. However the police, without justification, detained and searched us.

23. I had a small pin knife in my back pocket which I had taken off of a patron and had not yet had an opportunity to go upstairs and voucher it.

*[signature: Gregory Small]*

Sworn before me this 29 day of March, 2011

_____

NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015

4

VS.

**SMALL, GREGORY**
_____
DEFENDANT

**09/03/1971**
_____
DATE OF BIRTH

**646 RUTLAND RD**
_____
ADDRESS

**BROOKLYN        NY      11210**
_____
CITY          STATE   ZIP

**08/15/2010**
_____
ISSUE DATE

DOCKET NUMBER: 2010SK117227
_____

SUMMONS NUMBER: 4315511183
_____

**AC** 10-133 V
_____
ARRAIGNMENT CHARGES

CASE DISPOSITION INFORMATION:

| DATE | COURT ACTION | JUDGE | PART |
|------|-------------|-------|------|
| 10/15/2010 | DISM - LEGALLY INSUFFICIENT | **WILLIAMS,J** | **SAP-D** |

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN THIS COURT.

_____
COURT OFFICIAL SIGNATURE AND SEAL

**02/15/2011**
_____
DATE

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL **UNLESS EMBOSSED WITH THE**
COURT SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)



1347- 351-7375

Case 1:08-cv-01340-ERK-VVP Document 60-2 Filed 08/02/11 Page 16 of 28 PageID
#: 590
Case 1:08-cv-01340-ERK-VVP Document 51-5 Filed 04/21/11 Page 16 of 28

# Exhibit 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------X
CITY OF NEW YORK;

                         Plaintiff

      --Against --

                                **Index No.: 60015/2011**
                                **AFFIDAVIT OF**
                                **CHRISTOPHER**
                                **MANGAL**

THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY;
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                                    Defendants
-------------------------------------------------------------X

**CHRISTOPHER MANGAL** being duly sworn and deposed, states that:

I am one of the managers at Temptation Tavern located at 2210 Church Avenue in Brooklyn, New York.

On August 14, 2010, while I was working as a manger, Temptations Tavern's staff followed its regular procedures with respect to the sale of alcohol to patrons/consumption of alcohol by patrons/security and proper comportment of patrons *as is depicted on relevant and time-stamped* DVDs that we have provided to this Honorable Court for its review. Those procedures are as follows:

<u>Security and proper comportment of patrons</u>

1.    On August 14, 2010, the management team arrived at approximately 11:00 p.m., which is about an hour before we typically begin accepting patrons at 12:00 a.m. We typically have at least twenty-two (22) guards on duty each night, for no more than 351 patrons each night;

1

2.   The management team walked around the club several times to ensure that all staff were performing their assigned functions and got the club ready to open

3.   We also telephoned the 70 precinct to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club;

4.   We had a fifteen minute meeting to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss any events of the previous nights and to review our written list of banned individuals to make sure no such individuals are admitted;

5.   As is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away. I do not recall if any individuals on August 14, 2010 had any controlled substances and/or marijuana on their persons. But, if any of the potential patrons did have controlled substances and/or marijuana, they would have been turned away before they even entered the building.

6.   While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

7.   Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

8.   In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located. The bar team arrived at approximately 11:00 p.m., which is about an hour before we typically begin accepting patrons at 12:00 a.m.

9.   Once we were opened for business, we sold beer, wine and any other form of alcohol from 12:00a.m. to 4:00 a.m.

10.  The bar closes and we stop selling alcohol and any other type of beverage promptly at 4:00 a.m.

11.  However, at least 15 minutes before we close the bar, the DJ makes an announcement over the loudspeaker that we are having a "last call" for the sale of alcoholic beverages and non-alcoholic beverages.

12.  At 4:00 am, an announcement is made that the bar is now closed and that the consumption of all beverages will be permitted up and until 4:30 am and that all unconsumed and partially consumed drinks would be confiscated at 4:30 am and that anybody found with an alcoholic beverage risked being arrested by the police.

13. Thereafter, our bar backs, typically five (5) in number, search for bottles, glasses or other containers, secure or discard them, and confiscate all drinks which are partially consumed or not yet consumed.

14. On August 14, 2010, I was arrested for "possession of alcoholic beverages."

15. I do not deny that as a manager I was responsible for alcoholic beverages, which we are permitted to store and sell, as we had a valid liquor license.

16. However, no alcohol was sold after 4:00 am while I was the supervisor on duty, and none was consumed after 4:30 a.m. while I was on duty. Importantly, no patron was openly smoking marijuana on the premises, and in fact, there are numerous "no smoking" signs posted around the club. Further, throughout the night, as is club policy, we make announcements throughout the night, that no marijuana smoking or the consumption of other controlled substances are permitted on the premises, and that violators will be banned from the club.

17. No patron was openly smoking marijuana on the premises on August 14, 2010. The assertion is totally false.

*Christoph Mangal*

Sworn before me this _22_ day of March, 2011

_____
NOTARY PUBLIC

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2015

Case 1:08-cv-01340-ERK-VVP Document 51-5 Filed 04/21/11 Page 20 of 28

# Exhibit 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------X
CITY OF NEW YORK;

                              Plaintiff

        --Against –

                                        **Index No.: 60015/2011**
                                        **AFFIDAVIT OF**
                                        **DESRON FORDE**

THE LAND AND BUILDING KNOWN AS 2210 CHURCH
AVENUE, TAX BLOCK #5103 TAX LOT #32, COUNTY
OF KINGS, City and State of New York; GUYANA RESTAURANT
BAKERY CORP.; THE NEW YORK STATE LIQUOR AUTHORITY;
"JOHN DOE" and "JANE DOE", fictitiously named parties,
true names unknown, the parties intended being the owner,
lessees, operators or occupants of "Temptations,"
the establishment, doing business within
2210 CHURCH AVENUE, Brooklyn, NEW YORK,
and any person claiming any right, title or interest
in the real property which is the subject of this action.
                                        Defendants
------------------------------------------------------------X

**DESRON FORDE** being duly sworn and deposed, states that:

I am one of the security guards at Temptation Tavern located at 2210 Church Avenue in Brooklyn, New York. I am duly licensed as a Security Guard in the State of New York, and that my license is attached to this affidavit.

On October 10, 2010 while I was working as a security guard, Temptations Tavern's staff followed its regular procedures with respect to the sale of alcohol to patrons/consumption of alcohol by patrons/security and proper comportment of patrons *as is depicted on relevant and time-stamped* DVDs that we have provided to this Honorable Court for its review. Those procedures are as follows:

<u>Security and proper comportment of patrons</u>

1.    On October 10, 2010, the team arrived at approximately 11:00 p.m., which are about an hour before we typically begin accepting patrons at 12:00 a.m. We typically have at least twenty-two (22) guards on duty each night, for no more than 351 patrons each night;

2.    We made a thorough search of the entire premises to make sure no illegal

1

contraband or potentially dangerous instruments or weapons were secreted inside of the premises or in its curtiliages. We do such sweeps each night that Temptations is expected to open for business;

3. We checked all of the radios to make sure they were in proper functioning order;

4. We ran diagnostics of the fire alarm system and the fire sprinkler system to ensure operability;

5. We ran diagnostics on the "ID" machine, which scans patrons' IDs to make sure they are valid and not fraudulent, and to create a record of each and every individual who is admitted. This machine also ensures that nobody under the age of 21 is admitted;

6. Patrons presented their IDs for scan when they joined the queues outside for admittance;

7. We checked the surveillance cameras to ensure that they were in proper working order;

8. We set up police barricades (which were donated to us by the New York City Police Department) outside, to ensure that patrons queued in an orderly fashion, separated by gender;

9. We also telephoned the 70 precinct to ensure that a police officer would be on duty outside Temptations, or that a manned RMP would be on stationed in front of the club;

10. We always have a fifteen meeting to designate which areas of Temptations the security guards would be responsible for patrolling, to distribute bright yellow vests with the words "security" to the non-undercover security guards, to discuss events of the any previous nights and to review our written list of banned individuals to make sure no such individuals are admitted;

11. Right before the doors were opened for business, we placed two licensed security guards a the beginning of the queues to check for illegitimate and /or illegal IDs and to ensure that all patrons were at least 21;

12. We placed four security guards on the queue outside to search patrons outside, before they even entered the building. While patrons were being searched outside, potential patrons were instructed to empty the contents of their pockets, purses or other bags into containers which we provided. Only after those contents have been emptied into a container and examined, did additional security guards conduct thorough pat-down searches of the potential patrons.

13. During this search, anything in liquid form, any forms of "medication", any pens or sharp objects –even combs -- stayed in secured containers until their owners patrons left for the night. Once those items were retrieved from the patrons, the patrons were not permitted re-entry at anytime that night.

14. Moreover, as is policy, any individuals found with drugs or controlled substances, including, but not limited to, marijuana, are not permitted entry and they are turned away. I do not recall if any individuals on October 10, 2010 had any controlled substances and/or marijuana on their persons. But, if any of the potential patrons did have controlled substances and/or marijuana, they would have been turned away before they even entered the building.

15. While we have never found a gun or firearm on a potential patron, it is Temptation's policy to secure such weapons if they are found, to detain individuals found with such weapons and to alert the police immediately.

16. Individuals found with knives or instruments which are obviously fashioned for or to be used as knives, are turned away after the such knives or instruments which are obviously fashioned for or used as knives, are taken away from the potential patrons.

17. Once the patrons entered the lobby, we conducted foot searches to check for any other weapons and controlled substances that might be secreted in the shoes of potential patrons. If controlled substances were found during these "foot searches," any potential patrons with such controlled substances are turned away, are not admitted and are politely asked to leave. When other smaller weapons or instruments, which could be fashioned to be used as weapons are found on potential patrons, those potential patrons are turned away, they are not admitted and they are politely asked to leave.

18. Importantly, Temptations has a VIP access card which allows patrons free admittance, so long as they continue to follow our rules and regulations which entails, "no sneakers," "no du rags," "no hats," "no hoodies," "no drugs of any kind," "no weapons," "no gang affiliation attire," and "no fighting." We have about eight hundred (800) card-carrying VIP members, whose names, addresses and telephone numbers we have logged in our database for marketing as well as security purposes.

19. Once the patrons went through the foot searches in the lobby, they were required to pay admittance fees or to present their VIP cards for free access.

20. In the wintertime, once patrons have paid their admittance fee or have shown their VIP access cards, they are shown to coat check where their coats are secured. This is mandatory. No coats are allowed past the initial lounge area where the coat check is located.

21. On October 10, 2010 at approximately 3:30 am, I observed three women suddenly begin punching and kicking at each other. None of them possessed any weapons. I and a co-worker, Eugene Reese, who is also a security guard, immediately separated the women, and escorted two of them out of the club. One of the females, who was apparently the victim, was allowed to stay in the club, so that she would not be assaulted in further outside of the club. These women were not, to my knowledge, on the list of banned individuals. The fight was all of a sudden, and it was totally unforeseeable. No loud argument had preceded the fight, and we broke it up as soon as it started.

3

22.     I also understand that one of the dates in question, that I allegedly possessed marijuana while outside the club. Here, me and Gregory Small, another security guard, followed an individual who had been starring at Gregory Small. We thought this guy might have had some knowledge of the shooting of Small a few months earlier. We were trying to see his face. However, the police, without justification detained and searched me.

23.     The police told me that I smelled of marijuana, and issued to me a summons for possession of marijuana based solely on a belief that I smelled of marijuana. The police did not find any illegal contraband on me when I was searched. The charge was promptly dismissed and sealed on my very first court appearance.

_____

Sworn before me this____ day of March, 2011

_____
NOTARY PUBLIC

4

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS

CERTIFICATE OF DISPOSITION
NUMBER:40659

THE PEOPLE OF THE STATE OF NEW YORK
VS.

**NO FEE**

**FORDE, DESROUMARLO**

**07/28/1984**

DEFENDANT

DATE OF BIRTH

**149 96TH ST APT A5 A5**

ADDRESS

**BROOKLYN**            **NY**      **11209-7533**

CITY                STATE   ZIP

**08/14/2010**

ISSUE DATE

DOCKET NUMBER:**2010SK117302**

SUMMONS NUMBER: **4314170736**

**PL 221.05 00 0V**

ARRAIGNMENT CHARGES

CASE DISPOSITION INFORMATION:

| DATE | COURT ACTION | JUDGE | PART |
|------|-------------|-------|------|
| 10/15/2010 | **DISM - LEGALLY INSUFFICIENT** | **WILLIAMS,J** | **SAP-D** |

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN THIS COURT.

_____          **03/14/2011**

COURT OFFICIAL SIGNATURE AND SEAL          DATE

(CAUTION:  THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE
          COURT SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS

CERTIFICATE OF DISPOSITION
NUMBER: 40660

THE PEOPLE OF THE STATE OF NEW YORK
VS.

**NO FEE**

**FORDE, DESRON M**

DEFENDANT

**07/28/1984**

DATE OF BIRTH

**149 96TH ST APT A5 A5**

ADDRESS

**BROOKLYN**        **NY**        **112097533**

CITY                    STATE    ZIP

**08/14/2010**

ISSUE DATE

DOCKET NUMBER: **2010SK117302**

SUMMONS NUMBER: **4314170736**

**PL 221.05 00 0V**

ARRAIGNMENT CHARGES

CASE DISPOSITION INFORMATION:

| DATE | COURT ACTION | | JUDGE | PART |
|------|--------------|---|-------|------|
| 10/15/2010 | DISM - LEGALLY INSUFFICIENT | | WILLIAMS,J | SAP-D |

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN THIS COURT.

**03/14/2011**

COURT OFFICIAL SIGNATURE AND SEAL        DATE

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE
COURT SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)



SEALED

pursuant to Section 160.50 of the CPL

**431417073-6**

The People of The State of New York VS.

Susp/Rev Check ☐ Yes No ☐
Motorist Exhibited License ☐ Yes No ☐

| Last Name | First Name | M.I. |
|---|---|---|
| Forde | Degiou ma-lou | |

Street Address: 199 96th Street — Apt. No. A5

| City | State | Zip Code |
|---|---|---|
| Bklyn | NY | 11209 |

ID Number: 299940708 — Date of Birth: MO 7 DAY 28 YR 84 — Sex: M

| Lic. State | Lic. Class or ID Type | Date Expires | Operator Owns Vehicle |
|---|---|---|---|
| NY | ID | MO 7 DAY 28 YR 18 | ☐ Yes No ☐ |

**OPERATOR AND/OR OWNER OF VEHICLE BEARING LICENSE**

Plate No. — NY CT PA NJ Other — Reg. Expires

| PAS | OMT | COM | OMT | Other | | CHEV | FORD | HONDA | DODG | OLDS | BUICK | TOYT | NISS | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| SEDAN | SUBN | VAN | TRUCK | MCY | Other | Van | Veh. Color | Alternate Plate | State |
|---|---|---|---|---|---|---|---|---|---|

VIN No.

**THE PERSON DESCRIBED ABOVE IS CHARGED AS FOLLOWS**

| AM ☐ Time PM ☐ | Date of Offense | County | Precinct |
|---|---|---|---|
| 6 50 | 8/14/10 | Kings | 70 |

Place of Occurrence: C/o Marteuse & Flatbush a

IN VIOLATION OF:

Sec 221.05 Sub — V.T.L. Traff. Rules / Admin. Code / Penal Code / Other

Description of Violation, If Not Shown Below. (If returnable to Criminal Court, indicate Court Location and Date of Appearance below and COMPLETE, DATE, AND SIGN INFORMATION ON REVERSE SIDE.)

Posession Of Marijuana

| SPEEDING | | DISOBEY TRAFF CONT DEV | Uninspec. Veh. | Unreg. Veh. | Unlic. Oper. |
|---|---|---|---|---|---|
| MPH | In MPH Zone | ☐ Sign ☐ Signal — Pave ☐ Marks | Uninsur. Veh. | Com. Veh. | Bus — Haz. Mat. |

The person described above is summoned to appear at CRIMINAL COURT — Summons Part — County

Located at: 346 Broadway — 15Fl NY

| Date of Appearance | 9:30 a.m. | 21 day of Oct | year 2016 |
|---|---|---|---|

I personally observed the commission of the offense charged above. False statements made herein are punishable as a Class A Misdemeanor pursuant to Section 210.45 of the Penal Law. Affirmed under penalty of perjury.

Rank/Full Signature of Complainant

Complainant's Full Name (printed): Rodriguez — Command Code: 294

Agency/NCIC: NYPD — Squad: T2 — Tax Registry No.: 931061

I acknowledge receipt of this summons. I understand it is my responsibility to read and comply with the instructions on my copy, and that my signature below is not an admission of guilt.

Name_____ Date_____

Rightcous

1347 662 - 0451



NEW YORK STATE DEPARTMENT OF STATE
DIVISION OF LICENSING SERVICES

DESRON M FORDE

IS DULY REGISTERED AS A

SECURITY GUARD

ID: 1001271928
EXP: 04/06/12

This does not confer NYS Employee Status

NEW YORK STATE

IDENTIFICATION CARD   CLASS ID

ID: 299 940 708

FORDE
DESRON,MARLON
149 95TH STREET A5
BROOKLYN NY 11209
DOB: 07-28-84
SEX JM   EYES BR   HT 6-04
NONE
NONE
ISSUED 09-17-09